# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Raymond Price,

        Plaintiff,                         Case No. 2:18-cv-949

        v.                               Judge Sarah D. Morrison
                                            Magistrate Judge Chelsey M. Vascura

United States of America, *et al.*,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Ambulatory Care Solutions of Ohio, LLC.[1] (ECF No. 31.) Plaintiff filed a Memorandum in Opposition to the Motion (ECF No. 33), and Defendant filed a Reply (ECF No. 41). The matter is now ripe for decision.

## I.     STATEMENT OF THE FACTS

Plaintiff Raymond Price, a veteran, is a patient of the Department of Veterans Affairs ("VA") Medical Center in Belmont County, Ohio (the "VA-Belmont"). (Amended Compl. ¶ 35, ECF No. 25.) The VA-Belmont is a part of the VA-Pittsburgh Health System ("VAPHS"). (*Id.* ¶¶ 2–3.) In March 2015, the VA entered into a contract with Ambulatory Care Solutions, LLC, ("ACS") to provide primary care services at the VA-Belmont (the "Contract"). (U.S. Mot. Dismiss Ex. A, ECF No. 27-1, at 1, 9–10.) At some point, ACS formed Defendant Ambulatory Care Solutions of Ohio, LLC, ("ACS of Ohio") to fulfill these contractual obligations and to

---

[1] Plaintiff's Amended Complaint names Ambulatory Care Solutions, LLC, as a defendant. (ECF No. 25, at 1–2.) Ambulatory Care Solutions of Ohio, LLC, filed an Answer, contending that it is the proper defendant and was misidentified as Ambulatory Care Solutions, LLC, in the Amended Complaint. (ECF No. 26.) On January 3, 2020, the parties filed a status report stipulating that Ambulatory Care Solutions of Ohio, LLC, is the appropriate defendant and should be substituted as such. (ECF No. 51.)

operate the VA-Belmont. (ECF No. 51, ¶ 2.) During the relevant time period, until at least November 2016, the providers at the VA-Belmont were employed by ACS of Ohio. (Christina Hood Aff. ¶ 4, ECF No. 31-1.)

Pursuant to this Contract, ACS was responsible for "comply[ing] with all relevant VA policies and procedures, including those related to quality, patient safety and performance . . . ." (ECF No. 27-1, at 7.) These policies and procedures included VHA Directive 2009-019 and VHA Directive 1088 (collectively, the "Directives"), which govern the transmission of results for diagnostic tests at VA clinics. (Amended Compl. Exs. 2, 4, ECF Nos. 25-2, 25-4.)

Mr. Price has been a patient of the VA-Belmont for several years. (Pl. Opp. to Def. Mot. for Summ. J. Ex. 8, ECF No. 33-9.) He has gone to the VA-Belmont for his routine annual lab work, and he plans to continue to do so. (*Id.*) As a part of his annual lab work, the VA-Belmont tests Mr. Price's Prostate-Specific Antigen ("PSA") levels because of his family history of cancer. (ECF No. 25 ¶¶ 36–37.) PSA is a protein produced by the prostate, and elevated levels of PSA (above four ng/ml) indicate a risk of prostate cancer. (*Id.* ¶¶ 37–38.)

On October 2, 2015, Mr. Price had blood drawn at the VA-Belmont, and a nurse practitioner sent his blood to the VAPHS laboratory for testing, including a PSA test. (*Id.* ¶¶ 40, 43, 44.) Mr. Price left the VA-Belmont without receiving the results of his PSA test. (*Id.* ¶¶ 41–42.) VAPHS completed the PSA test later that same day and, at some point, notated in Mr. Price's medical record that he had an elevated PSA level of 61.98 ng/ml. (*Id.* ¶¶ 42, 44.)

On October 9, 2015, VAPHS sent Mr. Price's October 2, 2015, blood test results to his regular primary care provider, who works outside of the VA system. (*Id.* ¶ 48; Amended Compl. Ex. 5, ECF No. 25-5.) This transmission did not include the results of the PSA test. (ECF No. 25 ¶ 49.)

Over one year later, on October 28, 2016, Mr. Price returned to the VA-Belmont for another PSA test. (*Id.* ¶ 54.) This test showed that Mr. Price's PSA level had further increased to 145.36 ng/ml. (*Id.*) On November 16, 2016, Mr. Price visited the VA-Belmont where he learned for the first time that his PSA levels were elevated. (*Id.* ¶¶ 55, 58.)

Shortly after Mr. Price learned this information, he sought treatment from an oncologist, Dr. Gregory Merrick, at Wheeling Hospital. (*Id.* ¶ 60.) On December 13, 2016, Dr. Merrick diagnosed Mr. Price with advanced prostate cancer. (*Id.* ¶¶ 60, 63) According to Dr. Russell Pachynski, another oncologist, Mr. Price's prostate cancer "progress[ed] and spread to a substantial and significant degree" between the time of the October 2, 2015, PSA test and the October 28, 2016, test. (Amended Compl. Ex. 7, ECF No. 25-7 ¶ 6.)

On November 15, 2017, Mr. Price submitted an administrative claim of medical malpractice to the VA. (ECF No. 25 ¶ 66.) On June 13, 2018, the VA denied Mr. Price's claim on the grounds that the relevant VA-Belmont employees were contract employees[2], precluding liability for the United States. (U.S. Mot. Dismiss Ex. B, ECF No. 27-2.) Mr. Price contends that he did not, and could not have known with the exercise of reasonable diligence, that the providers at the VA-Belmont were employed by ACS.[3] (ECF No. 25 ¶ 76.) He contends that the VA-Belmont providers never told him that they were employed by ACS, that he always believed he was receiving care from the VA, and that he never knew about the existence of ACS until receiving the VA's June 13 letter. (Raymond Price Aff. ¶¶ 3–6, ECF No. 25-6.)

---

[2] In its letter, the VA identified its contractor as ACS. (ECF No. 27-2.) There is no mention in the letter of the existence of ACS of Ohio.

[3] Mr. Price's Amended Complaint references ACS rather than ACS of Ohio. The Court assumes for purposes of this motion that Mr. Price's assertions about ACS apply in equal measure to Defendant ACS of Ohio.

On August 23, 2018, Mr. Price filed a Complaint against the United States and against ACS. (Compl., ECF No. 1.) On March 7, 2019, Mr. Price filed an Amended Complaint. (ECF No. 25.) The Amended Complaint pleads allegations of negligence against ACS (Count One) and the United States (Counts Two and Three). (*Id.* at 21–28.) The parties have since agreed to substitute ACS of Ohio for ACS as the appropriate defendant. (ECF No. 51.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.    ANALYSIS

Mr. Price alleges in Count One that ACS of Ohio, "by and through its employees and agents," acted negligently by failing to: follow VA policies and directives, inform Mr. Price of his elevated PSA levels in a timely manner, develop and implement appropriate policies and procedures to ensure timely communication of lab results, and train and supervise its employees regarding the communication of lab results. (ECF No. 24 ¶ 87.) In other words, Mr. Price alleges that ACS of Ohio is vicariously liable for the alleged medical negligence of its employees. At its core, ACS of Ohio argues in its Motion for Summary Judgment that Mr. Price's claim is barred by Ohio's one-year statute of limitations on medical negligence claims. (Def. Mot. Summ. J., at 7–9, ECF No. 31.)[4] However, ACS of Ohio is only correct if Mr. Price's claims are "medical claims" under Ohio law.

### A.    Whether Count One is a "Medical Claim" under Ohio Law

Pursuant to § 2305.113 of the Ohio Revised Code, a "medical . . . claim" must be brought "within one year after the cause of action accrued." Ohio Rev. Code Ann. § 2305.113(A) (West 2019). A "medical claim" is "any claim that is asserted in any civil action against a . . . hospital"[5] or any employee or agent of a "hospital . . . that arises out of the medical diagnosis, care, or treatment of any person." *Id.* § 2305.113(E)(3). In turn, "hospital"  is defined as "any person, corporation, association, board, or authority that is responsible for the operation of any hospital" or "clinic that employs a full-time staff of physicians practicing in more than one recognized

---

[4] ACS of Ohio also prophylactically argues that because it is a private entity, it cannot be held liable under the Federal Tort Claims Act. (ECF No. 31, at 5–7.) Mr. Price concedes this and has made clear that he is only pursuing a negligence claim under state law against ACS of Ohio. (ECF No. 33, at 5 (ACS of Ohio's "motion should be denied because [ACS of Ohio] is liable to Plaintiff under the state related negligence claim, not the Federal Tort Claims Act (FTCA).").)

[5] Ohio law permits medical claims to be brought against other persons and entities, including physicians, nurses, and residential facilities. *Id.* § 2305.113(E)(3). However, the Court finds that ACS of Ohio could only, if at all, fall into the "hospital" category, and ACS of Ohio makes no argument to the contrary.

medical specialty and rendering advice, diagnosis, care, and treatment to individuals" while excluding "any hospital operated by the government of the United States or any of its branches." *Id.* § 2305.113(E)(1).

There are three words or phrases in this statutory scheme that are relevant to ACS of Ohio's Motion for Summary Judgment—"hospital," "medical claim," and "within one year after the cause of action accrued." The Court addresses the first two here and in the next section analyzes the third.

The first issue is whether ACS of Ohio is a "hospital" as defined in § 2305.113(E)(1). Mr. Price argues that he has filed a claim against a "healthcare clinic" rather than a hospital. (ECF No. 33, at 14.) This argument is unavailing. "Hospital" is specifically defined as any authority that is responsible for operating a "clinic" that employs full-time physicians, practices in multiple medical specialties, and renders advice, diagnosis, care, and treatment. All available evidence shows that ACS of Ohio fits this definition.

Mr. Price next argues that ACS of Ohio is not a "hospital" because of § 2305.113(E)(1)'s exclusion of any facilities "operated by the government of the United States . . . ." The Court has already concluded that the United States did not "control" (and thus did not "operate[]") the VA-Belmont. (*See* ECF No. 42, at 6–7.)[6] Because ACS of Ohio was responsible for operating a healthcare clinic that met the requirements of the statute, ACS of Ohio is a "hospital" under § 2305.113.

Given that ACS of Ohio is a hospital, the next question is whether Count One is a "medical claim" under Ohio law. At the core of Count One—and, indeed, the Amended

---

[6] Mr. Price also argues that the United States contractually retained the right to control ACS of Ohio's lab reporting protocols. (ECF No. 33, at 10–13.) It is not clear why this matters for purposes of ACS of Ohio's liability. Regardless, the Court already rejected this argument. (*See* ECF No. 42, at 8.)

Complaint—is the alleged failure by the VA-Belmont to provide Mr. Price timely notice of his 2015 PSA test results. As a result, whether this constitutes a "medical claim" depends on whether this allegation "arises out of" Mr. Price's "medical diagnosis, care, or treatment." The Court finds that it does.

To "arise" means "[t]o originate[,] to stem (from)[,]" or "[t]o result (from)." *Arise*, Black's Law Dictionary (10th ed. 2014). The terms "diagnosis" and "treatment" relate "to the identification and alleviation of a physical or mental illness, disease, or defect." *Browning v. Burt*, 613 N.E.2d 993, 1003 (Ohio 1993). And "care," in this context, "means the prevention or alleviation of a physical or mental defect or illness." *Id.* Accordingly, Mr. Price's claim regarding the VA-Belmont's failure to notify him of his 2015 PSA test results is a "medical claim" if it originated, stemmed, or resulted from the prevention, identification, or alleviation of a physical or mental defect, illness, or disease.

It is clear from this language alone that a claim alleging the failure to provide the results of a diagnostic test falls squarely within the definition of "medical claim." The reason why Mr. Price had his PSA levels tested on an annual basis was because he has a family history of cancer and because his doctors sought to ensure that his levels remained within the normal range. That is, Mr. Price's medical providers were using this test as a way to identify a potential diagnosis of prostate cancer. Mr. Price's doctors and nurses would no doubt be puzzled if anyone questioned whether they were testing Mr. Price's PSA levels for any other reason than for prevention, identification, or alleviation of a physical or mental defect, illness, or disease.

Mr. Price tries to avoid this obvious conclusion by characterizing the transmission of his test results as a purely administrative failure requiring no "professional skill." (ECF No. 33, at 17.) In support of his argument, he relies on the Ohio Supreme Court's passing usage of the

language "professional skill" when analyzing the confines of a "medical claim." *See, e.g.*, *Rome v. Flower Mem'l Hosp.*, 635 N.E.2d 1239, 1242 (Ohio 1994). But correctly reporting the results of a PSA test requires at least as much "professional skill" as the activities that the Ohio courts have found to have met this seemingly low threshold. *See, e.g.*, *id.* at 1241–42 (radiology intern improperly secured patient to table for an X-ray); *Brittingham v. Gen. Motors Corp.*, No. 24517, 2011 WL 6352294, at *1, *4 (Ohio Ct. App. Dec. 16, 2011) (failure to explain results of lung function test to patient); *Grubb v. Columbus Cmty. Hosp.*, 691 N.E.2d 333, 334–36 (Ohio Ct. App. 1997) (orderly transferring patient on gurney between diagnostic procedures caused patient to fall down stairs).

While the literal communication of the results of a laboratory test may require less medical expertise than, for example, a surgery or a physical examination, there is no doubt that it is still a crucial part of a patient's diagnosis, treatment, and care. (*See* ECF No. 42, at 8 ("It defies logic to say that reporting blood test results is not part of the 'medical, professional aspects of services rendered.'").) VHA Directive 2009-019—on which the Amended Complaint heavily relies—proves that the VA agrees with this determination, given that it specifically obligates VA facilities to ensure that test results are "communicated by licensed or certified health care staff." (ECF No. 25-2, at 5.)

In an effort to prove that reporting test results is too administrative to constitute a "medical claim," Mr. Price cites a litany of cases in which Ohio courts have ruled that various negligent acts were not "medical claims." These cases are inapt—they involve random accidents divorced from medical diagnosis, treatment, or care. *See, e.g.*, *Conkin v. CHS-Ohio Valley, Inc.*, No. A-1104723, 2012 WL 2367391, at *1–3 (Ohio Ct. App. June 22, 2012) (nursing home employees dropped patient while moving her from wheelchair to a lift so she could shower); *Hill*

*v. Wadsworth-Rittman Area Hosp.*, 925 N.E.2d 1012, 1013, 1016 (Ohio Ct. App. 2009) (patient tripped over wheelchair footrests while being wheeled out of hospital); *Summers v. Midwest Allergy Assocs., Inc.*, No. 02AP-280, 2002 WL 31894902, at *7 (Ohio Ct. App. Dec. 31, 2002) (cabinet at allergy clinic fell onto patient); *Balascoe v. St. Elizabeth Hosp. Med. Ctr.*, 673 N.E.2d 651, 653 (Ohio Ct. App. 1996) (patient slipped on plastic in hospital bathroom). These accidents—unlike the failure to report the results of a diagnostic test—are the types of accidents that could occur in any environment. It just so happens that in these cases they occurred in medical settings. It is only these fortuitous slip-and-fall-in-the-hospital claims that are the types of torts that the Ohio legislature intended to carve out of § 2305.113 by specifically—yet broadly—defining "medical claim," not a claim involving the transmission of diagnostic test results.

The above analysis encompasses Mr. Price's allegation that ACS of Ohio was negligent in failing to timely provide him with his PSA test results. However, the remainder of Count One of the Amended Complaint contains additional allegations of negligence. As mentioned above, Count One of the Amended Complaint also accuses ACS of Ohio of acting negligently by failing to 1) follow VA policies and directives, 2) develop and implement appropriate policies and procedures to ensure timely communication of lab results, and 3) train and supervise its employees regarding the communication of lab results.

The third is squarely foreclosed by § 2305.113(E)(3)'s definition of "medical claim." The statute provides that medical claims include claims arising out of medical diagnosis, care, or treatment that also result from the "training" or "supervision . . . of caregivers providing medical diagnosis, care, or treatment." Ohio Rev. Code Ann. § 2305.113(E)(3)(c)(ii). Because Mr. Price alleges that ACS of Ohio failed to adequately train and supervise its employees only in the

context of failing to timely provide him with his PSA test results, this aspect of the claim is barred by the same one-year statute of limitations as is the allegation of the failure to timely provide the results.

However, Mr. Price alleges that ACS of Ohio was not just vicariously negligent, but also was *directly* negligent by failing to follow VA policies and directives and to develop and implement appropriate policies and procedures to ensure timely communication of lab results. These allegations do not stem from the prevention, identification, or alleviation of a physical or mental defect, illness, or disease. *Cf. Browning*, 613 N.E.2d at 1003–04 (concluding that a claim against a hospital for negligent credentialing is not a "medical claim" because it does not arise out of medical diagnosis, care or treatment). Rather, they deal with hospital administration and compliance. To the extent Mr. Price suffered bodily harm as a result of the hospital's negligent administration and compliance, such a claim may fall within § 2305.10, which has a two-year statute of limitations. *See* Ohio Rev. Code § 2305.10(A) (West 2019).

Having said this, even if ACS of Ohio was negligent in this regard, liability requires the breach of a duty owed *to Mr. Price specifically*. *See Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 200 (Ohio 1998) (noting that a negligence claim requires that a defendant breach a duty that it owed to the plaintiff); *see Gelbman v. Second Nat'l Bank of Warren*, 458 N.E.2d 1262, 1263 (Ohio 1984) (per curiam) ("In Ohio it is well-established that liability in negligence will not lie in the absence of a special duty owed by the defendant."). To the extent ACS of Ohio was contractually obligated to comply with the VA's policies and directives, it owed these contractual duties to the VA, not to Mr. Price. But while Mr. Price is not a party to the Contract, he could be an intended beneficiary. That would mean that ACS of Ohio owed a duty to him, too. *See Hill v. Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784–85 (Ohio 1988) (adopting

Restatement (Second) of Contracts provision that contractual duties can be owed to an intended beneficiary of a contract). But the beneficiary of a contract who is not an intended beneficiary is an incidental beneficiary and has no enforceable rights under the contract. *Id.*

ACS of Ohio did not address these points in its Motion for Summary Judgment. Instead, ACS of Ohio relied solely on its argument that Mr. Price's claim was entirely a medical claim. In turn, Mr. Price has not had the opportunity to explain whether he was an intended beneficiary of the Contract and thus whether his non-medical claims can proceed. On this limited ground, the Court denies ACS of Ohio's Motion for Summary Judgment on Mr. Price's non-medical claims alleging direct negligence by ACS of Ohio.

### B.     Accrual Date of Mr. Price's Medical Claim

Having concluded that Mr. Price has pleaded a medical claim, the Court must now determine when that claim accrued. A medical claim accrues upon the occurrence of a "cognizable event." *Allenius v. Thomas*, 538 N.E.2d 93, 96 (Ohio 1989). "A 'cognizable event' is the occurrence of facts and circumstances which lead, or should lead, the patient to believe that the physical condition or injury of which she complains is related to a medical diagnosis, treatment, or procedure that the patient previously received." *Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992). The statute of limitations begins to run even if the plaintiff has not "discovered all the relevant facts necessary to file a claim . . . ." *Id.* Rather, "[t]he occurrence of a 'cognizable event' imposes upon the plaintiff the duty to (1) determine whether the injury suffered is the proximate result of malpractice and (2) ascertain the identity of the tortfeasor or tortfeasors." *Id.* at 1288. But while "the occurrence of the cognizable event imposes a duty of inquiry on the plaintiff," it is not the case "that the plaintiff has a duty to ascertain the cognizable event itself, especially in a situation . . . where the patient had no way of knowing" key facts

surrounding his medical care. *Akers v. Alonzo*, 605 N.E.2d 1, 3–4 (Ohio 1992)."Whether the 'cognizable event' relates to the discovery of the tortfeasor's identity is a question of law." *Flowers*, 589 N.E.2d at 1289.

Having said this, there is one circumstance in which a "cognizable event" will not necessarily trigger the statute of limitations. When the plaintiff's medical claim arises out of an ongoing physician-patient relationship, the statute of limitations does not begin to run until after "the physician-patient relationship for that condition terminates . . . ." *Frysinger v. Leech*, 512 N.E.2d 337, 341 (Ohio 1987). This rule, known as the termination rule, also extends to a hospital when the patient's relationship is with the hospital rather than with a particular practitioner. *Amadasu v. O'Neal*, 891 N.E.2d 802, 806–07 (Ohio Ct. App. 2008); *Ram v. Cleveland Clinic Found.*, No. 80447, 2002 WL 1587858, at *3 (Ohio Ct. App. July 18, 2002).

Importantly, the termination rule does not require that the relationship with the allegedly negligent doctor or hospital be severed entirely in order to suspend the statute of limitations. Rather, the statute of limitations begins to run as soon as the relationship for the particular *condition* terminates. *Frysinger*, 512 N.E.2d at 341; *cf. Omni-Food & Fashion, Inc. v. Smith*, 528 N.E.2d 941, 943–44 (Ohio 1988) (relying on *Frysinger* to hold that statute of limitations for legal malpractice claims begin to run after the conclusion of "legal representation regarding a particular undertaking or transaction"). This makes sense because the termination rule is motivated by the twin policy goals of giving the alleged tortfeasor the opportunity to mitigate the patient's damages and alleviate the effects of his or her negligence and encouraging the parties to resolve their dispute short of litigation. *Frysinger*, 512 N.E.2d at 341; *see also Ram*, 2002 WL 1587858, at *3. Once treatment for a particular condition has concluded, the opportunity to

mitigate has passed, and it makes less sense to continue to suspend the statute of limitations, even if the medical relationship remains intact.

Beginning with the termination rule, Mr. Price has not put forth sufficient evidence to show that he had an ongoing relationship with the VA-Belmont for a particular "condition." In fact, his evidence affirmatively shows that he did *not* have such an ongoing relationship. Mr. Price attests that he continues to go to the VA-Belmont for his annual lab work; however, his evidence shows that he goes elsewhere for his other medical needs since his primary care doctor and his oncologist are outside of the VA system. While it is possible that visiting the VA-Belmont on an annual basis for routine testing constitutes a "relationship" with that facility, Mr. Price has offered no law or argument that it constitutes a relationship for a particular *condition*. The Court finds that Mr. Price had no ongoing relationship with the VA-Belmont for a particular condition, and he cannot avail himself of the termination rule.

Thus, barring any tolling or estoppel, in order for Mr. Price's medical claim to survive, the relevant "cognizable event" must have occurred no later than August 23, 2017, one year prior to the filing of the Complaint. Mr. Price argues this to be the case, that the cognizable event occurred when he learned the identity of ACS in June 2018. The Court disagrees.

There are two Ohio Supreme Court cases that are particularly illustrative as to what constitutes a "cognizable event." First, in *Flowers v. Walker*, the plaintiff, Arlene Flowers, began to pursue a claim of medical negligence after finding out that she had a cancerous lump in her breast that had not been discovered during a mammogram. 589 N.E.2d at 1285–86. However, Ms. Flowers did not discover the identity of the radiologist who had interpreted her mammogram until over a year after she learned that she had cancer. *Id.* at 1286. Ms. Flowers subsequently sued the radiologist within one year of discovering his identity but more than one year after her

cancer diagnosis. *Id.* The court concluded that the "cognizable event" was Ms. Flowers's cancer diagnosis, not her discovery of the radiologist's identity, and that she had had a duty to discover the radiologist's identity after she became aware of the potential negligence (i.e., after the cancer diagnosis). *Id.* at 1287–88.

Subsequently, the court decided *Akers v. Alonzo*, this time ruling in favor of the plaintiff. *See* 605 N.E.2d at 3–4. After the plaintiff, Ralph Akers, had his bladder biopsied three times, his urologist reported each time that he had found no evidence of cancer. *Id.* at 1. A few months later, Mr. Akers saw a second urologist, who diagnosed him with cancer. *Id.* Four years later, Mr. Akers learned for the first time that the pathology slides from his first three biopsies had been misinterpreted by a third doctor, Dr. de Lamerens. *Id.* at 1–2. The court distinguished *Flowers* on the grounds that while Ms. Flowers might not have initially been aware of the identities of those who had misinterpreted her mammogram, she was at least aware of their existence. *Id.* at 3. In contrast, there was no evidence that Mr. Akers knew or should have known any earlier of Dr. de Lamerens's involvement or his misinterpretation of the pathology slides; in fact, Mr. Akers did not know that the slides even existed. *Id.* Accordingly, the court determined that because Mr. Akers had "had no way of knowing either that there had been another physician involved or that that other physician had made an incorrect diagnosis," it was Mr. Akers's discovery that Dr. de Lamerens had misinterpreted the pathology slides that was the cognizable event. *Id.* at 3–4.

The Court concludes from *Flowers* and *Akers* that Ohio law obligates a plaintiff alleging medical negligence to work diligently to determine the identity of the tortfeasor(s) upon becoming aware of alleged negligence. However, if there exists a tortfeasor who was potentially involved in the alleged negligence of whom the plaintiff was unaware and had no reason to be

aware, the statute of limitations does not begin to run until the existence of that tortfeasor becomes known (or should have become known).

It is tempting to think that *Akers* is the governing precedent because of Mr. Price's asserted unawareness of ACS's existence prior to June 2018, which ACS of Ohio offers no evidence to refute. However, whereas what Mr. Akers lacked was the knowledge of the existence of a potential primary tortfeasor, what Mr. Price lacked was the knowledge of the existence of the *employer* of a potential primary tortfeasor. In terms of the medical claim, ACS of Ohio is only liable to the extent its employees were negligent (i.e., through vicarious liability). In other words, ACS of Ohio could not itself have been negligent, but only derivatively so. This conclusion is not based on an assessment of ACS of Ohio's culpability but rather only on an observation of the fact that ACS of Ohio, as a non-human entity, could only act through one if its human employees.

Before elaborating on the importance of this distinction, some background on vicarious liability is necessary. Under Ohio law, one is not liable for the negligence of another except through vicarious liability. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 943–44 (Ohio 2009). In such a situation, the principal is merely secondarily liable—the subordinate tortfeasor remains primarily liable for its actions. *Comer v. Risko*, 833 N.E.2d 712, 716 (Ohio 2005); *accord Tisdale v. Toledo Hosp.*, 967 N.E.2d 280, 284 (Ohio Ct. App. 2012) ("Under this theory, the liability of an employer for the negligence of the employee is secondary or passive, while the latter's liability is primary."). A common type of vicarious liability is *respondeat superior* by which an employer or principal is vicariously liable for the torts of its employees. *Wuerth*, 913 N.E.2d at 943–44.

Because an employer's vicarious liability is entirely dependent on the liability of its employees, such vicarious liability exists only where an employee can be held directly liable. *Id.* at 944. It follows that if the statute of limitations has run with respect to the employee (the primary tortfeasor) and thus he/she is immune from liability, the principal's secondary liability will simultaneously be extinguished. *See Comer*, 833 N.E.2d at 718 ("[T]here can be no viable claim for agency by estoppel if the statute of limitations against the independent-contractor physician has expired."); *Henry v. Mandell-Brown*, No. C-090752, 2010 WL 3239118, at *3 (Ohio Ct. App. Aug. 18, 2010) (dismissing claims against surgery center where claim against allegedly negligent doctor was not filed within statute of limitations period).

Based on these general principles, ACS of Ohio can only be held liable for medical errors committed by its employees through vicarious liability. *See Wuerth*, 913 N.E.2d at 942 ("[B]ecause only individuals practice medicine, only individuals can commit medical malpractice."); *Browning*, 613 N.E.2d at 1003 ("A hospital does not practice medicine and is incapable of committing malpractice."). As a result, in order for ACS of Ohio to be liable on the medical claim (again, without consideration of tolling or estoppel), it must be the case that its employees could have been held directly liable at the time the Complaint was filed. *See Wuerth*, 913 N.E.2d at 944. To be clear, while Mr. Price was well within his right to sue *only* ACS of Ohio, it must have been the case that Mr. Price *could have sued* the employees from whom ACS of Ohio would derive liability. *See id.* ("Although a party injured by an agent may sue the principal, the agent, or both, a principal is vicariously liable only when an agent could be held directly liable."); *Tisdale*, 967 N.E.2d at 321–22 (allowing suit against hospital where statute of limitations had run against allegedly negligent employees at time of briefing but had not when complaint was filed).

ACS of Ohio's status as a secondary tortfeasor is what distinguishes ACS of Ohio from Dr. de Lamerens in the case of *Akers*. Mr. Akers's ability to establish the liability of Dr. de Lamerens was independent of his ability to establish the liability of the other doctors. Here, however, ACS of Ohio's liability is entirely dependent on the liability of its employees.

Because Mr. Price had all of the requisite facts at the time of his cancer diagnosis on December 13, 2016, that diagnosis was the "cognizable event" for purposes of § 2305.113. Barring a tolling period or estoppel, the statute of limitations on the direct liability of ACS of Ohio's employees for the medical claim began to run on December 13, 2016, and expired one year later.

The Court recognizes the ostensible unfairness of these circumstances. But it should be noted that this harsh result stems from Ohio's legislative choice to maintain a one-year statute of limitation on most medical claims, a legislative choice that this Court and the parties must obey.

**C.     Tolling and Estoppel**

Since Mr. Price did not file his Complaint until August 2018, and because the statute of limitations on the medical claim expired in December 2017, Mr. Price's medical claim against ACS of Ohio is timely only if the limitations period was tolled or if ACS of Ohio is estopped from asserting a statute of limitations defense. Regarding the issue of tolling, the Court finds it unnecessary to address the legal merits of this claim because it fails on the facts. As the Court concluded above, the statute of limitations on Mr. Price's medical claim began to run after he received his cancer diagnosis on December 13, 2016. Mr. Price filed his administrative claim on November 15, 2017, which left only one month on the limitations period. However, after Mr. Price's administrative claim was denied on June 13, 2018, he waited more than two additional months to file his Complaint on August 23, 2018. Accordingly, even if the seven months

between November 15, 2017, and June 13, 2018, are excluded, it is still the case that Mr. Price filed his medical claim late.

"Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *State ex rel. Chavis v. Sycamore City Sch. Dist. Bd. of Educ.*, 641 N.E.2d 188, 196 (Ohio 1994). In Ohio, equitable estoppel may be used to prohibit inequitable use of a statute of limitations defense. *See McCualsky v. Appalachian Behavioral Healthcare*, 100 N.E.3d 1049, 1054–55 (Ohio Ct. App. 2017) ("To invoke the doctrine as a bar to [a] statute of limitations defense . . . the plaintiff must be able to show the defendant's specific actions prevented the plaintiff from timely filing the lawsuit."). "[R]eliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630, 633 (Ohio 1990). The invocation of equitable estoppel generally requires actual or constructive fraud. *Chavis*, 641 N.E.2d at 196; *see Frantz*, 555 N.E.2d at 633 ("The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice.").[7]

Constructive fraud does not require proof of fraudulent intent. *Cohen v. Estate of Cohen*, 491 N.E.2d 698, 700 (Ohio 1986). However, it does require the "'breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.'" *Id.* at 699–700 (quoting *Stanley v. Sewell Coal Co.*, 285 S.E.2d 679, 683 (W. Va.

---

[7] Mr. Price argues that the doctrine of agency by estoppel should apply. (ECF No. 33, at 18–19.) This doctrine has been used to hold a hospital liable for the negligence of its independent contractors. *See Clark v. Southview Hosp. & Family Health Ctr.*, 628 N.E.2d 46, 53 (Ohio 1994) ("A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital . . . ."). This doctrine is inapt because the allegedly negligent individuals at the VA-Belmont were *employees* of ACS of Ohio, not independent contractors. It is *ACS of Ohio* that was an independent contractor (of the VA), not the individual medical providers.

1981)). Fraud can be based not only on affirmative misrepresentations, but also on a party's failure to fully disclose material facts when there exists a duty to speak. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1269 (Ohio Ct. App. 1996); *see also Gaines v. Preterm-Cleveland, Inc.*, 514 N.E.2d 709, 712 (Ohio 1987) (establishing that a claim for fraud can be based on concealment of a fact by someone with a duty to disclose it).

ACS of Ohio cites to an Ohio Eighth District Court of Appeals case for the proposition that equitable estoppel in the context of a statute of limitations defense requires "either an affirmative statement that the statutory period to bring an action was larger than it actually was[,] promises to make a better settlement of the claim if plaintiff did not bring the threatened suit, or similar representations or conduct on defendant's part." (Def. Reply, at 13, ECF No. 41 (citing *Livingston v. Diocese of Cleveland*, 710 N.E.2d 330, 339 (1998)).) The Court is not bound by decisions of the Ohio intermediate appellate courts, and their decisions are not persuasive if the Court is convinced that the Ohio Supreme Court would decide things differently. *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 289 (6th Cir. 2015).

The Court finds the analysis by the Eighth District Court of Appeals in *Livingston* to be thin and unsupported and is not persuaded that the Ohio Supreme Court would agree with it. *Livingston* cites to another Eighth District Court of Appeals case, which in turn adopted this test from a United States Court of Appeals for the Ninth Circuit case. *See Cerney v. Norfolk & W. Ry. Co.*, 662 N.E.2d 827, 830 (Ohio Ct. App. 1995) (citing *Atkins v. Union Pac. R.R. Co.*, 753 F.2d 776, 777 (9th Cir. 1985) (per curiam)). That Ninth Circuit case established a test designed to fit the facts of the particular case before it, which involved allegations of bad faith during settlement discussions. *See Atkins*, 753 F.2d at 777. The *Atkins* court gave no indication that such a test would apply outside of this factual context, and the Eighth District Court of Appeals applied this

test in a more general context without any explanation. Neither the Eighth District Court of Appeals nor ACS of Ohio has provided any explanation why equitable estoppel should apply differently (and in such a limited fashion) in the particular context of a statute of limitations claim. The Court sees no reason why it should, and at least one other Ohio intermediate appellate court appears to agree. *See McCualsky*, 100 N.E.3d at 1054–55 (allowing invocation of equitable estoppel where plaintiff shows defendant's specific actions prevented plaintiff from timely filing suit).

Accordingly, Mr. Price may invoke equitable estoppel to estop ACS of Ohio from relying on a statute of limitations defense if he can prove that ACS of Ohio engaged in constructive or actual fraud by failing to fully disclose material facts when it had a duty to do so, he reasonably relied on these incomplete facts, and he acted to his detriment. It also must be the case that Mr. Price did not know and could not have known that ACS of Ohio's conduct was misleading.

The Court finds that Mr. Price has put forth sufficient evidence to put in dispute whether ACS of Ohio engaged in constructive fraud and is thus entitled to further discovery on his medical claim.[8] As Mr. Price's healthcare provider, it is clear that there is certain information that ACS of Ohio had a duty to provide to him. *See, e.g.*, *Nickell v. Gonzalez*, 477 N.E.2d 1145, 1148 (Ohio 1985) (discussing physician's duty to disclose material risks and dangers involved with proposed treatment). Whether it had a duty to provide its identity—and if so, when—is less clear. But because ACS of Ohio has not argued that it had no such duty, it is not entitled to summary judgment on this point regardless.

---

[8] Mr. Price has not yet produced any evidence of *actual* fraud by ACS of Ohio or by the VA. Constructive fraud is based on the effect of an individual's conduct, while actual fraud is based on an individual's *intended* conduct. The two should not be conflated. Mr. Price is advised to refrain from allegations of actual, intentional fraud unless and until he has evidence to support such a claim.

As for the second and third elements, Mr. Price has presented sufficient evidence that he relied on his misimpression that the VA operated the VA-Belmont and that he did so to his detriment. He filed his administrative claim within one year of the statute of limitations, which gives rise to two inferences. First, this demonstrates that Mr. Price thought that he had been harmed by the VA and had to proceed against it through the administrative process. Second, the Court can—and at this stage, must—conclude from this information that if Mr. Price had known about ACS of Ohio's identity, he would have filed a claim against ACS of Ohio, or sent them a 180-day letter[9], in November 2017 instead of or in addition to filing this administrative claim.

That leaves the final element, whether Mr. Price knew or should have known that ACS of Ohio's conduct was misleading. ACS of Ohio does not dispute Mr. Price's contention that he did not have actual knowledge of ACS of Ohio's identity, so the point of contention is on the issue of constructive knowledge. The only piece of evidence that ACS of Ohio offers to show that Mr. Price should have known that ACS of Ohio operated the VA-Belmont is a screenshot of a Belmont County Outpatient Clinic webpage (the "Exhibit B Website") that says, at the bottom, "Operated by Ambulatory Care Solutions." (Def. Mot. Summ. J. Ex. B., ECF No. 31-2.)

As Mr. Price points out, there are multiple reasons why this screenshot does not prove nearly as much as ACS of Ohio says it does. First, this screenshot was taken on July 4, 2019. (ECF No. 31-2). Even now, the Exhibit B Website says that it was last updated on March 25, 2019. *See* https://www.va.gov/directory/guide/facility.asp?id=968 (last visited Jan. 14, 2020). Because ACS has offered no evidence as to what the Exhibit B Website looked like prior to March 25, 2019, the probative value of this screenshot is minute.

---

[9] *See* Ohio Rev. Code § 2305.113(B)(1) (allowing extension of statute of limitations by 180 days upon notice to putative defendant prior to expiration of the one-year statute of limitations).

Second, the established factual record demonstrates legitimate—and justified—confusion by the VA and Mr. Price as to who exactly operated the VA-Belmont. The parties now agree that ACS of Ohio operated the VA-Belmont and is the appropriate defendant in this matter. However, this is apparently news to the VA, which contracted with ACS (not ACS of Ohio) and identified ACS (not ACS of Ohio) as its contractor in its letter to Mr. Price. (ECF Nos. 27-1, 27-2.) Moreover, ACS of Ohio's screenshot also shows that the VA identified the VA-Belmont's operator as ACS—not ACS of Ohio. (ECF No. 31-2.) Thus, the parties' recent stipulation indicates that the statement on the Exhibit B Website is false. The Court passes no judgment at this time on whether the distinction between ACS and ACS of Ohio is a material one. However, at this posture, the Court must construe these facts in the light most favorable to Mr. Price and assume that it is. This alone is enough to warrant denial of summary judgment on the issue of estoppel.

Third, the Court notes from the record evidence, (*see, e.g.*, Geoffrey Brown Aff. ¶ 7, ECF No. 33-2), and from itself visiting the websites relied on by the parties, that while it appears possible to navigate to the Exhibit B Website from Google, the Court has found it impossible to get to the Exhibit B Website from within the VA website. That is, when entering "Belmont County VA" into Google, the second option that came up for the Court[10] was the Exhibit B Website.[11] However, upon navigating away from this website, the Court found it impossible to return to it without returning to Google. For example, when choosing "Belmont County VA

---

[10] Different Google results can appear for different users. *See* Natasha Bach, Google's 'Filter Bubble' Can Manipulate Your Search Results, Study Suggests, https://fortune.com/2018/12/04/google-search-results-filter-bubble/ (last visited Jan. 14, 2020).

[11] *See* https://www.google.com/search?sxsrf=ACYBGNR0qc7jNclpN2pn3me6HERHNWKXSA%3A
1579039553040&source=hp&ei=QDseXt_dPI7W5gLul4iICg&q=Belmont+County+VA&oq=Belmont+County+V
A&gs_l=psy-ab.3..35i199i175i39j35i39j0i22i30l5j0i22i10i30j0i22i30l2.3692.6107..6481...1.0..0.179.2130.3j14....
2..0....1..gws-wiz.......0i322j0i199i291j0j0i199i291i131j0i322i131j0i199i175j0i322i199i175j0i20i263.nMfBkidxtm
k&ved=0ahUKEwjf_ZHdjlTnAhUOq1kKHe4LAqEQ4dUDCAg&uact=5 (last visited Jan. 14, 2020).

Clinic" from the list of VAPHS locations[12], the resulting website shows no indication that ACS or ACS of Ohio plays any role in the VA-Belmont.[13] As a result, the Court finds that ACS of Ohio's statement that "Plaintiff merely needed to conduct an internet search to discover Ambulatory Care Solutions operated the" VA-Belmont is misleading at best.

The Court finds it troubling that ACS of Ohio not only omitted the aforementioned "last updated" date on its exhibit, but also that ACS of Ohio has overstated how easy it is to navigate to the website. The Court is equally troubled by misstatements by Mr. Price. For example, Mr. Price accuses ACS of Ohio of not informing the Court that "Exhibit B is not an accurate representation of the way the VA's website looks even today." (ECF No. 33, at 4.) This statement is false. Exhibit B is an identical representation of how the website looks today, despite omitting the bottom half of the page. Counsel for both parties are advised to be mindful of their professional responsibilities, specifically their duty of candor under the Ohio Rules of Professional Conduct, which this Court has adopted. *See* S.D. Ohio Model Fed. Rules of Disciplinary Enforcement IV.B; Ohio R. Prof'l Conduct 3.3(a)(1).

In sum, Mr. Price may continue to pursue his medical claim against ACS of Ohio on the theory that ACS of Ohio is estopped from asserting a statute of limitations defense on the basis of constructive fraud (or actual fraud, should the evidence ultimately support such a theory).

---

[12] *See* https://www.pittsburgh.va.gov/locations/ (last visited Jan. 14, 2020).

[13] *See* https://www.pittsburgh.va.gov/locations/belmont.asp (last visited Jan. 14, 2020).

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED**.


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**