UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Raymond Price,

       Plaintiff,                         Case No. 2:18-cv-949

          v.                        Judge Sarah D. Morrison
                                        Magistrate Judge Chelsey M. Vascura

United States of America, *et al.*,

       Defendants.

## OPINION AND ORDER

This matter is before the Court on three Motions for Summary Judgment. Defendant United States of America has filed a Motion for Summary Judgment (ECF No. 60) to which Plaintiff has responded (ECF No. 66) and the United States has replied (ECF No. 73). Defendant Ambulatory Care Solutions of Ohio, LLC, ("ACS of Ohio") has filed a Supplemental Motion for Summary Judgment (ECF No. 62) to which Plaintiff has responded (ECF No. 68) and ACS of Ohio has replied (ECF No. 75). Plaintiff filed a Motion for Partial Summary Judgment pertaining to his claims against ACS of Ohio. (ECF No. 61.) ACS of Ohio filed a Memorandum in Opposition (ECF No. 72), and Plaintiff filed a Reply (ECF No. 76). These matters are now ripe for decision.

## I.    FACTUAL BACKGROUND

### A.    The VA-Belmont

In March 2015, the VA Pittsburgh Healthcare System ("VAPHS"), a branch of the Department of Veterans Affairs ("VA"), entered into a contract (the "Contract") with Ambulatory Care Solutions, LLC, ("ACS") to provide primary care services at a VA Medical Center located in Belmont County, Ohio (the "VA-Belmont"). (ECF No. 61-12.) At some point,

ACS formed Defendant ACS of Ohio to fulfill its contractual obligations and to operate the VA-Belmont. (ECF No. 51, ¶ 2.) Beyond this, the relationship between ACS and ACS of Ohio remains unknown. During the relevant time period, until at least November 2016, the providers at the VA-Belmont were employed by ACS of Ohio. (Christina Hood Aff. ¶ 4, ECF No. 31-1.)

Pursuant to the Contract, ACS was responsible for "comply[ing] with all relevant VA policies and procedures, including those related to quality, patient safety and performance . . . ." (ECF No. 61-12, at 7.) These policies and procedures included VHA Directive 2009-019 and VHA Directive 1088, which governed the transmission of results for diagnostic tests at VA clinics. (ECF Nos. 61-15, 61-16.) Pursuant to the former, a clinician ordering a diagnostic test at a VA clinic was required to communicate the test results to the patient within fourteen days. (ECF No. 61-15, at 4.) VHA Directive 1088, which went into effect on October 7, 2015, requires "test results requiring action" to be communicated even more quickly, within seven days. (ECF No. 61-16, at 4.)

The VA maintained some oversight of the VA-Belmont to ensure ACS's compliance with VA policies. For example, in June 2015, the VA Office of Inspector General ("OIG") evaluated the VA-Belmont to assess its "environment of care." (ECF No. 66-6.) On September 15, 2015, the OIG issued a report criticizing the VA-Belmont for failing to notify patients of test results within fourteen days. (*Id.* at 16.) Specifically, the OIG found that VA-Belmont "[c]linicians did not consistently notify 16 of 46 patients (34 percent) of their lab results within" that time frame. (*Id.*)

In response to these findings, the OIG recommended that, by January 31, 2016, patients be consistently notified of laboratory results within fourteen days. (*Id.* at 26.) In an August 5,

2015, memorandum in response to the OIG's recommendation, VAPHS pledged to take various steps to achieve this goal. (*Id.*)

### B. Raymond Price

Plaintiff Raymond Price annually visits the VA-Belmont for routine lab work. (Raymond Price Aff. ¶¶ 2–3, ECF No. 33-9.) As a part of his annual lab work, the VA-Belmont tested Mr. Price's Prostate-Specific Antigen ("PSA") levels because of his family history of cancer. (Russell Pachynski Letter, at 5, ECF No. 61-6; Aaron Feliz Letter, at 1, ECF No. 61-8; Jonathan Burroughs Report, at 10, ECF No. 61-11.) PSA is a protein produced by the prostate, and elevated levels of PSA indicate a risk of prostate cancer. A PSA level greater than 2.0 ng/ml in Mr. Price's demographic group is abnormal and requires further evaluation. (Feliz Letter, at 2.)

In 2012 and 2013, when the VA-Belmont tested Mr. Price's PSA levels, his levels were "at the high end of normal" for the average male but were abnormal for someone in his demographic group. (*Id.* at 1–2.) The VA-Belmont did not test Mr. Price's PSA levels in 2014. (*Id.* at 1.)

On October 2, 2015, Mr. Price went in for his annual lab work. (*Id.*; ECF No. 66-9.) Mr. Price was seen by a nurse practitioner who sent his blood to the VAPHS laboratory for testing, including a PSA test. (Feliz Letter, at 2; ECF No. 66-9.) When Mr. Price's appointment concluded that afternoon, his lab results had not yet been processed. (ECF No. 66-9, at 5, 7.) Mr. Price left the VA-Belmont without receiving the results of his PSA test.

The VAPHS laboratory completed Mr. Price's PSA test later that same evening and input the results into his medical records at 7:14pm. (ECF No. 60-5, at 3.) His PSA level was measured at 61.98 ng/ml, well above normal. (*Id.*) A PSA value above sixty has a greater than seventy-five percent positive predictive value for prostate cancer. (Feliz Letter, at 2.)

Two days earlier, on September 30, 2015, Mr. Price had submitted a request for the VA to fax his "recent bloodwork" to his primary care doctor, Daniel Jones, who works outside the VA system. (ECF No. 60-2.) Dr. Jones's office faxed this request to the VA at 9:24am. (*Id.*) In response to this request, the VAPHS laboratory sent at least some of Mr. Price's test results to Dr. Jones, although which results were sent and when they were sent remains contested. The VA contends that on October 9, 2015, VAPHS sent to Dr. Jones the results of all of Mr. Price's tests from September 1, 2015, to October 9, 2015, including his 2015 PSA test results. (Glenn Morrison Decl. ¶¶ 7, 8, ECF No. 60-1; ECF Nos. 60-3 – 60-5.)

Dr. Jones's records tell a different story. According to Dr. Jones's notes in Mr. Price's chart, Mr. Price went in for an appointment on September 30, 2015; at the conclusion of this appointment, at 9:39am, Dr. Jones was expecting to get lab results from the VA "soon." (ECF No. 66-11, at 5.) Dr. Jones must have received some lab results from the VA within the next two weeks because the chart says that Dr. Jones discussed Mr. Price's lab results with him on October 13, 2015. (ECF No. 66-13, at 10.) However, the only document in Dr. Jones's records showing lab results from VAPHS is a lab report that was printed on September 30, 2015, at 9:43am (about twenty minutes after Dr. Jones's office submitted the records request to the VA). (ECF No. 66-11, at 6.) This report only contains Mr. Price's lab results from tests occurring between September 29, 2014, and September 30, 2015. (*Id.*) Because this lab report was printed prior to Mr. Price's October 2 visit, it does not contain the results of his 2015 PSA test. And because Mr. Price had not had his PSA levels tested in 2014, the report contains no information about Mr. Price's PSA levels. Thus, besides the VA's say-so, there is no evidence that VAPHS ever provided Dr. Jones with Mr. Price's 2015 PSA test results.

Over one year later, on October 28, 2016, Mr. Price returned to the VA-Belmont for another PSA test. (Feliz Letter, at 3.) Mr. Price's PSA level had increased to 145.36 ng/ml, a figure indicative of widely-metastatic stage IV prostate cancer. (*Id.*) On November 16, 2016, Mr. Price returned to the VA-Belmont where he learned for the first time that his PSA levels were elevated. (Raymond Price Aff. ¶ 5, ECF No. 61-3). After follow-up testing, Mr. Price was diagnosed with advanced prostate cancer. (Feliz Letter, at 3; Russell Pachynski Aff. ¶ 5, ECF No. 61-5.)

## II.     PROCEDURAL BACKGROUND

In November 2017, Mr. Price submitted an administrative claim of medical malpractice to the VA. (ECF No. 61-23.) On June 13, 2018, the VA wrote Mr. Price denying his claim on the ground that the relevant VA-Belmont employees were contract employees, precluding liability for the United States. (ECF No. 61-25.) At that time, the VA identified ACS as the contractor that operated the VA-Belmont until September 2016 but did not mention ACS of Ohio. (*Id.*)

Mr. Price contends that prior to June 13, 2018, he had never heard of ACS and that he was not aware that the clinicians at the VA-Belmont were not VA employees. (Raymond Price Aff. ¶¶ 4–6, ECF No. 61-17.)

On August 23, 2018, Mr. Price filed a Complaint against the United States and against ACS. (Compl., ECF No. 1.) On March 7, 2019, Mr. Price filed an Amended Complaint. (ECF No. 25.) The Amended Complaint pleads allegations of negligence against ACS (Count One) and the United States (Counts Two and Three). (*Id.* at 21–28.) The parties have since agreed to substitute ACS of Ohio for ACS as the appropriate defendant. (ECF No. 51.)

The United States subsequently moved to dismiss the Amended Complaint for lack of subject matter jurisdiction on the ground of sovereign immunity. (ECF No. 27.) The Court

granted this motion in part, finding that the United States had not waived its sovereign immunity

for any negligence committed by its contractor (ACS) but finding that the United States could

still be liable for negligence by its own employees. (ECF No. 42.) Specifically, the Court found

that the United States could be liable for negligence in two possible circumstances: 1) the

"actions of VAPHS employees surrounding the PSA testing (and the transmission of the test

results)" or 2) "through VAPHS's supervision of the employees at the VA-Belmont, to the extent

that it had a responsibility to do so." (*Id.* at 10.) The United States now moves for summary

judgment on both remaining theories of liability. (ECF No. 60.)

 ACS of Ohio filed an early Motion for Summary Judgment arguing that Count One was

a "medical claim" that had been filed outside of the one-year statute of limitations for medical

claims under Ohio law. (ECF No. 31.) The Court denied the motion on two grounds. (ECF No.

52.) First, the Court found that a portion of Count One was not a medical claim, concluding that

any allegations that ACS of Ohio had been "*directly* negligent by failing to follow VA policies

and directives and to develop and implement appropriate policies and procedures to ensure

timely communication of lab results" was not a medical claim and was not time-barred. (*Id.* at

10.) Second, the Court concluded that although the remainder of Count One was a medical claim

that had been filed outside of the one-year statute of limitations, Mr. Price had presented

sufficient evidence that ACS of Ohio should be "estopped from asserting a statute of limitations

defense on the basis of constructive fraud . . . ." (ECF No. 52, at 23.) ACS of Ohio has filed a

Supplemental Motion for Summary Judgment on all remaining theories of liability. (ECF No.

62.)

 Mr. Price has also filed a Motion for Partial Summary Judgment on four matters related

to ACS of Ohio's liability—1) that ACS of Ohio deviated from the standard of care when it

delayed notifying Mr. Price about his 2015 PSA test results, 2) that Mr. Price was an intended beneficiary of the Contract, 3) that ACS of Ohio breached its duty to Mr. Price by failing to follow VA policies and directives, and 4) that ACS of Ohio is equitably estopped from asserting its statute of limitations defense.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV.    ANALYSIS

### A.    Claims Against the United States

As explained above, the Court previously ruled that the claim against the United States premised on the negligence of the VAPHS employees could proceed. The United States now contends that the VAPHS employees were not negligent because they properly conducted the PSA test on Mr. Price's blood, they transmitted the results to Mr. Price's medical records, and they provided the results to Dr. Jones. The first two points are not in dispute. However, granting summary judgment on the third—that VAPHS provided the PSA results to Dr. Jones—would impermissibly require that the facts be construed in the light most favorable to the United States, not to Mr. Price.

It is clear from Dr. Jones's records that he received *some* results from VAPHS, but the evidence does not prove that these records included the 2015 PSA test results. In fact, the results Dr. Jones received were printed before Mr. Price's 2015 PSA test occurred. A reasonable inference from these records is that VAPHS provided Dr. Jones with Mr. Price's test results immediately after receiving the records request on the morning of September 30, 2015, but did not provide any later test results, including the PSA test that occurred two days later.

Moreover, Dr. Jones's lack of follow-up with Mr. Price also gives rise to the inference that he did not receive the results of Mr. Price's PSA test. Mr. Price has offered evidence that his test results were of great medical concern, so it is reasonable to expect that had Dr. Jones been aware of these concerning results, he would have followed up on them. That he did not do so indicates he may not have been aware of them.

A genuine dispute remains whether VAPHS negligently failed to provide the results of Mr. Price's 2015 PSA test to Dr. Jones. The United States' Motion for Summary Judgment on this claim is **DENIED**.

The second theory of liability that the Court permitted to proceed at the motion to dismiss stage was based on the United States' allegedly negligent supervision of the VA-Belmont, to the extent it had a responsibility to do so. The United States now argues that this claim is barred by sovereign immunity and thus the Court lacks subject matter jurisdiction to decide it.[1] The United States is correct.

The United States has waived its sovereign immunity to tort suits via the Federal Tort Claims Act ("FTCA"), but this waiver is subject to various exceptions. *Snyder v. United States*, 590 F. App'x 505, 509 (6th Cir. 2014). One such exception, known as the discretionary function exception, excludes from the FTCA an agency or government employee's "exercise or performance or . . . failure to exercise or perform a discretionary function . . . ." 28 U.S.C. § 2680(a). This is a broad exception that applies to any discretionary actions "involv[ing] policy-based judgments." *Snyder*, 590 F. App'x at 509.

Governmental action or inaction falls within the discretionary function exception if the act or omission "'involves an element of judgment'" and "the nature and quality of that judgment [is] of the type the exception seeks to shield from liability (*i.e.* concerning matters of policy)." *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)). Deciding whether a decision is a matter of policy is an objective inquiry. *Rosebush v. United States*, 119 F.3d 438, 444 (6th Cir. 1997). The question "is whether the challenged actions are '*susceptible* to policy analysis,' not

---

[1] An argument that the Court lacks subject matter jurisdiction over a particular issue may be raised at any time. *Franzel v. Kerr Mfg. Co.*, 959 F.2d 628, 630 (6th Cir. 1992).

whether they were *the result of* a policy analysis." *Id.* (emphasis added) (quoting *Gaubert*, 499 U.S. at 325).

The first step in deciding whether the discretionary function exception applies "is to determine exactly what conduct is at issue." *Id.* at 441. The exception applies if the conduct at issue involves an agency or governmental employee acting through an exercise of judgment rather than in accordance with an express and explicit legal mandate. *See Snyder*, 590 F. App'x at 510. Here, the conduct at issue is the manner in which VAPHS supervised the contractors operating the VA-Belmont. Mr. Price points to no legal mandate governing how VAPHS was to conduct this supervision. "Supervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function." *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005). Such oversight is in the government's discretion even when it comes to something as serious as safety protocols. *See Berrien v. United States*, 711 F.3d 654, 658 (6th Cir. 2013) ("[T]he law is clear that the government may delegate its safety responsibilities to independent contractors in the absence of federal laws or policies restricting it from doing so." (internal quotation marks omitted)); *cf. United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 819–20 (1984) (holding that FAA's decisions in monitoring airplane safety are discretionary).

Mr. Price emphasizes that the VA carved out a role for itself in how test results were reported at the VA-Belmont by agreeing to "ensure" that results were provided to patients in a timely fashion. (*See, e.g.*, Pl. Resp. to USA Mot. for Summ. J., at 4, 6, ECF No. 66.) But it was in VAPHS's sole discretion to decide how best to ensure that this pledge was fulfilled.

That VAPHS decided to audit the VA-Belmont does not cabin the VA's discretion. *See Gowdy v. United States*, 412 F.2d 525, 529 (6th Cir. 1969) ("The mere reservation of the right to

inspect the work did not impose upon the Government any duty of inspection or control."). It was in VAPHS's discretion not only to decide how to monitor the VA-Belmont, but also to decide how best to respond to any discovered shortcomings. These types of decisions are capable of policy analysis—and thus are in the agency's discretion—because they require consideration of how best to use limited resources to achieve safety goals. *Cf. Wilburn v. United States*, 745 F. App'x 578, 582 (6th Cir. 2018) (holding that VA had discretion to decide closing speed of VA hospital elevator doors); *Berrien*, 711 F.3d at 661 (determining that Army's "decision to spot check for safety compliance" at military base fell within discretionary function exception); *Totten v. United States*, 806 F.2d 698, 701 (6th Cir. 1986) (finding that Air Force's decisions as to safety clothing and equipment "involved discretionary decisions based not only on safety but also on such considerations as budgetary and time constraints and the availability of personnel with expertise . . . ."). While the VA has a legal duty to provide health care for the nation's veterans, it has the discretion to do so as it sees fit, and it has no duty to do so at all costs.

The Court's decision that the discretionary function exception applies has nothing to do with the propriety of the VA's actions in this case. Indeed, in terms of the legal analysis "it simply does not matter whether the VA was negligent." *Wilburn*, 745 F. App'x at 582. What matters is whether the VA acted here in a matter that was within its sole discretion. It did. The Court thus lacks subject matter jurisdiction to decide whether the VA was negligent in how it supervised the VA-Belmont.

This aspect of the Amended Complaint is **DISMISSED** for lack of subject matter jurisdiction.[2]

---

[2] Although this issue has arisen at the summary judgment stage, the Court lacks jurisdiction to decide this issue on the merits, including to decide summary judgment. As a result, the United States' jurisdictional argument is treated as if raised in a motion to dismiss. *See Ogle v. Church of God*, 153 F. App'x 371, 375 (6th Cir. 2005).

**B.      Claims Against ACS of Ohio**

As explained above, Mr. Price has two remaining avenues of relief against ACS of Ohio—1) a non-medical claim that ACS of Ohio negligently failed to follow VA policies and procedures and to develop and implement appropriate policies and procedures to ensure timely communication of lab results (the "deficient policy claim") and 2) a medical malpractice claim against ACS of Ohio that can only proceed if ACS of Ohio is not permitted to assert a statute of limitations defense.

**1.      Deficient Policy Claim**

The Court previously concluded that Mr. Price's deficient policy claim was not a medical claim because it does "not stem from the prevention, identification, or alleviation of a physical or mental defect, illness, or disease." (ECF No. 52, at 10.) The Court thus determined that such a claim was not barred by Ohio's one-year statute of limitations for medical claims. (*See id.*)

However, this deficient policy claim, like any other negligence claim, requires proof that ACS of Ohio owed a duty of care to Mr. Price and that it breached that duty. *See Berdyck v. Shinde*, 613 N.E.2d 1014, 1020 (Ohio 1993). Even if ACS of Ohio had a duty to comply with the VA's policies and directives, this might not be a duty that was owed to Mr. Price. That is, although the Contract may have obligated ACS of Ohio to comply with VA policies and directives, this alone would be insufficient to establish that ACS of Ohio owed Mr. Price such a duty of compliance.

The Court opined that ACS of Ohio might have a duty to Mr. Price if he were an intended beneficiary of the Contract. (ECF No. 52, at 10–11.) But even assuming Mr. Price was an intended beneficiary of the Contract, this alone is not enough to provide for liability because that would only show that Mr. Price would have a right to enforce the Contract. *See Reisenfeld & Co.*

*v. Network Grp., Inc.*, 277 F.3d 856, 863 (6th Cir. 2002). Because Mr. Price has sued ACS of Ohio for negligence—a tort claim, not a contract claim—it does not matter whether he has a right to enforce the Contract. Rather Mr. Price must establish that ACS of Ohio breached a *tort duty* that it owed to him. *See Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1320 (Ohio 1983) ("[I]t is no tort to breach a contract . . . .").

Contractual and tort duties can overlap. *See, e.g.*, *id.* (comparing insurer's tort duty to act in good faith with its duty under an insurance contract). A contractual relationship can also create a tort duty. *See Motorists Mut. Ins. Co. v. Said*, 590 N.E.2d 1228, 1232 (Ohio 1992), *overruled in part by Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397 (Ohio 1994). But any tort duty arising from a contractual relationship remains separate from the contractual duty. "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996).

Mr. Price identifies no cases where a tort duty has been created by a contract (as opposed to a contractual relationship) under Ohio law, and the Court has been unable to find any. Thus, for the deficient policy claim against ACS of Ohio to survive, it must be the case that ACS of Ohio had a tort duty to either 1) abide by VA policies and procedures or 2) implement better policies regarding the timely communication of test results.

In determining whether ACS of Ohio had one of these duties, the Court looks to ACS of Ohio's relationship with Mr. Price and whether that relationship created an obligation for it to exercise due care toward him. *See Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1026 (Ohio 2002). Such an obligation can be created in a number of ways, including from the common

law, a legislative enactment, concepts of morals and justice, convenience, or based on the particular circumstances of a case. *Id.*

As for the first potential duty—the duty to abide by VA policies or procedures—ACS of Ohio had no such duty except to the extent that it agreed to do so—i.e., a contractual duty. VA policies or procedures only pertain to the VA and to others who agree to abide by them. Because ACS of Ohio had no independent legal duty to abide by VA policies and procedures, a breach of these policies or procedures could not itself give rise to a tort.

The second potential duty—ACS of Ohio's obligation to implement adequate policies regarding the timely communication of lab results—can certainly give rise to a tort. But ACS of Ohio's duty to implement adequate policies only existed vicariously as a result of the duty of care that its employees owed their patients at the VA-Belmont. *See Hanshaw v. River Valley Health Sys.*, 789 N.E.2d 680, 684, 686 (Ohio Ct. App. 2003) (concluding that while doctor had duty to report newborn's abnormal test results to the mother, the hospital did not have a statutory or common law duty to do so). Thus, this duty was incidental to the medical care that ACS of Ohio provided. *Cf. Fazzone v. W. Reserve Care Sys.*, No. 90 C.A. 72, 1991 WL 124428, at *1–2 (Ohio Ct. App. July 2, 1991) (holding that lawsuit alleging negligence in failure to sterilize operating room was a medical claim because use of surgical suite and equipment was incidental to the medical care provided). Outside of the medical duty of the practitioners at the VA-Belmont and ACS of Ohio's derivative responsibility for their actions, there was no duty by ACS of Ohio to report Mr. Price's test results to him. As a result, just as improperly providing test results is a medical claim, (ECF No. 52, at 7–8), the failure to implement appropriate policies related to providing test results is too. Mr. Price's deficient policy claim is thus another medical claim.

To put all of this more concretely, ACS of Ohio had a dual duty to promptly provide Mr. Price with his PSA test results, both to comply with VA policy (a contractual duty) and to ensure that it was providing adequate care to Mr. Price (a medical duty). Construing the facts in the light most favorable to Mr. Price requires the Court to conclude at this stage that ACS of Ohio should have immediately provided Mr. Price with his PSA test results. The results indicated an extraordinarily high risk of cancer, and immediate action was required. Only the medical duty is relevant to the negligence claim that Mr. Price has brought, and a breach of that tort duty can only give rise to a medical claim.

### 2. Equitable Estoppel and Equitable Tolling

The Court previously found that all of Mr. Price's medical claims are subject to a one-year statute of limitations that expired no later than December 13, 2017. (ECF No. 52, at 17.) Because all of Mr. Price's claims against ACS of Ohio are medical claims, including the deficient policy claim discussed above, they are untimely unless the statute of limitations is subject to the doctrines of equitable estoppel or equitable tolling.[3] (*See* ECF No. 52, at 20.)

To begin with, the parties conflate the concepts of equitable estoppel and equitable tolling. They are two separate doctrines. *Aronhalt v. Castle*, No. 12AP-196, 2012 WL 6035012, at *8 (Ohio Ct. App. Dec. 4, 2012); *see Cheatom v. Quicken Loans*, 587 F. App'x 276, 281 (6th Cir. 2014) (concluding the same for federal common law). Equitable estoppel can be invoked to toll a statute of limitations, but a statute of limitations can also be equitably tolled for other reasons, such as due to fraudulent concealment. *See Perkins v. Falke & Dunphy, LLC*, No. 25162, 2012 WL 6097104, at *3 (Ohio Ct. App. Dec. 7, 2012). ACS of Ohio argues that neither

---

[3] The Court previously determined that it need not decide the issue of whether the statute of limitations was tolled while Mr. Price's administrative claim was pending because that would not have affected the validity of his claim. (ECF No. 52, at 17–18.) However, the Court did not previously consider whether equitable tolling was appropriate.

equitable estoppel nor equitable tolling apply to this case but fails to distinguish between them. Because ACS of Ohio discusses both concepts, the Court assumes that it is seeking summary judgment with respect to both. The Court will analyze each in turn.

### a.    Equitable estoppel

"Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *State ex rel. Chavis v. Sycamore City Sch. Dist. Bd. of Educ.*, 641 N.E.2d 188, 196 (Ohio 1994). A prima facie case of equitable estoppel requires that the plaintiff prove four things: 1) the defendant made a factual misrepresentation; 2) the misrepresentation was misleading; 3) the defendant induced actual reliance by the plaintiff, and that reliance was reasonable and in good faith; and 4) that reliance caused detriment to the plaintiff. *Perkins*, 2012 WL 6097104, at *2.

Equitable estoppel may be used to prohibit inequitable use of a statute of limitations defense. *See McCualsky v. Appalachian Behavioral Healthcare*, 100 N.E.3d 1049, 1054–55 (Ohio Ct. App. 2017) (noting that to invoke equitable estoppel as a bar to a statute of limitations defense, the plaintiff must show the defendant's specific actions prevented him from timely filing the lawsuit); *Burkhalter v. Ohio State Highway Patrol*, No. 00AP-1310, 2001 WL 811858, at *2 (Ohio Ct. App. July 19, 2001) ("Equitable estoppel can preclude a defendant from asserting the bar of the statute of limitations where the misrepresentation induced a delay in the filing of the action."). But the Ohio Supreme Court has indicated that equitable estoppel applies differently when invoked to toll the statute of limitations. In that context, a plaintiff must show, at the very least, that the defendant acted in a manner that was "designed to prevent" the plaintiff from filing suit. *See Doe v. Archdiocese of Cincinnati*, 880 N.E.2d 892, 895 (Ohio 2008). There

16

must be some level of intentionality on the part of the defendant. Thus, for equitable estoppel to toll the statute of limitations, it is not enough for a plaintiff to reasonably rely to his detriment on a misleading misstatement by the defendant. The defendant's misleading statement must also have been made in a manner that was "designed to prevent" the plaintiff from filing suit.

ACS of Ohio argues that Mr. Price's burden is even greater, that he must prove that ACS of Ohio misled him with respect to the statute of limitations specifically. (ACS of Ohio Resp. to Pl. Mot. for Summ. J., at 14, ECF No. 72.) The Court has already rejected this argument, finding that it relies on thinly reasoned Ohio intermediate appellate court decisions. (ECF No. 52, at 19–20.) While the Sixth Circuit has previously cited to this same string of cases,[4] it has only done so in cases that are not precedential. *See United States v. Aleman-Ramos*, 155 F. App'x 845, 849 & n.1 (6th Cir. 2005) (criticizing district court for "inappropriately" relying on an "unpublished and non-precedentially binding" Sixth Circuit decision); *Smith v. Astrue*, 639 F. Supp. 2d 836, 841 (W.D. Mich. 2009) ("[U]npublished decisions of the Sixth Circuit do not bind anyone except the parties to those particular cases . . . ."). For the reasons previously stated, the Court does not believe that this is the proper standard. Regardless, because the Court ultimately finds that Mr. Price cannot meet the lower standard set out in *Doe*, it need not determine whether the standard is a stricter one.

Even assuming that he can meet the other elements of equitable estoppel and even assuming that this lower bar applies, Mr. Price cannot show that ACS of Ohio's actions were

---

[4] *See Berhad v. Advanced Polymer Coatings, Inc.*, 652 F. App'x 316, 324 (6th Cir. 2016); *Antioch Co. Litig. Tr. v. Morgan*, 644 F. App'x 579, 583 (6th Cir. 2016); *Walburn v. Lockheed Martin Util. Servs., Inc.*, 443 F. App'x 43, 48–49 (6th Cir. 2011). These cases also cite to another District Court of Appeals case for a similar proposition. *See Berhad*, 652 F. App'x at 324 (citing *Hoeppner v. Jess Howard Elec. Co.*, 780 N.E.2d 290, 297 (Ohio Ct. App. 2002)); *Antioch*, 644 F. App'x at 583 (same); *Walburn*, 443 F. App'x at 48 (same). But that cited case is also poorly reasoned. It improperly imports a standard about equitable *tolling* to the equitable *estoppel* context without any explanation for doing so. *See Hoeppner*, 780 N.E.2d at 297 (citing *Welfley v. Vrandenburg*, No. 95APE11-1409, 1996 WL 145467 (Ohio Ct. App. Mar. 29, 1996)).

"designed to prevent" him from filing suit. Mr. Price identifies multiple ways in which he claims that he was misled into believing that the VA-Belmont was operated by VA employees. For example, he points to the usage of VA signage at the VA-Belmont, correspondence he received from the VA, and the fact that when his counsel sent a letter to the VA-Belmont prior to initiating this lawsuit, it was the VA that responded rather than ACS of Ohio. (Pl. Mot. for Summ. J., at 10–13, ECF No. 61.) But none of these is evidence of any intent on the part of ACS of Ohio to stymy Mr. Price's efforts to sue. Rather, this is only indicative of the strict level of control that the VA maintained over how ACS operated the VA-Belmont. For example, as Mr. Price acknowledges, the VA signage was mandated by the Contract. (ECF No. 61-12, at 44.) Mr. Price presents no evidence that any of the identified actions were "designed to prevent" him from filing suit. Indeed, most of them occurred long before a lawsuit could have been predicted.

ACS of Ohio's Motion for Summary Judgment on the claim for equitable estoppel is **GRANTED**. Mr. Price's Motion for Summary Judgment on the same is **DENIED**.

### b. Equitable tolling

That leaves the doctrine of equitable tolling, which is rooted in general principles of equity. Equitable tolling is to be invoked only "'in compelling cases'" where "'a departure from established procedure'" is justifiable. *McCualsky*, 100 N.E.3d at 1055 (quoting *Sharp v. Ohio Civil Rights Comm'n*, No. 04 MA 116, 2005 WL 589889, at *2 (Ohio Ct. App. Mar. 10, 2005)). It "is to be applied sparingly and only in exceptional circumstances." *Id.* "A litigant seeking equitable tolling must demonstrate that he or she diligently pursued his or her rights, but some extraordinary circumstance stood in his or her way and prevented timely action." *Id.* These considerations must be made on a case-by-case basis. *Brown v. Ohio Dep't of Job & Family Servs.*, No. 08AP-239, 2008 WL 5197157, at *4 (Ohio Ct. App. Dec. 11, 2008). Whether

equitable tolling applies is a question for the Court to decide. *Zappone v. United States*, 870 F.3d 551, 562 (6th Cir. 2017). It is in the Court's discretion to decide whether there exist "extraordinary circumstances" warranting the application of the doctrine. *Sims v. Potter*, No. 5:05CV0708, 2006 WL 2792180, at *5 (N.D. Ohio Sept. 26, 2006).

The Ohio Supreme Court has not established a test for how to apply these general principles, and no consensus has developed among the intermediate appellate courts. Some have said that the doctrine "generally" applies only where the plaintiff is intentionally misled or tricked into missing the filing deadline. *Coleman v. Columbus State Cmty. Coll.*, 49 N.E.3d 832, 838–39 (Ohio Ct. App. 2015); *Unifund CCR Partners v. Young*, No. 11-MA-113, 2013 WL 5447666, at *7 (Ohio Ct. App. Sept. 27, 2013). Another Ohio court has looked to that factor but has also employed the same five-factor test that the Sixth Circuit uses, which looks at whether the plaintiff 1) lacked notice of a requirement to file suit, 2) lacked constructive knowledge of the filing requirement, and 3) was diligent in pursuing his rights; 4) whether there exists prejudice to the defendants; and 5) whether the plaintiff's ignorance of the particular legal requirement was reasonable. *Compare Moore v. Ohio Dep't of Rehab. & Corr.*, No. 10AP-732, 2011 WL 1225466, at *6 (Ohio Ct. App. Mar. 31, 2011), *with Cheatom*, 587 F. App'x at 281.

What is common across these cases, regardless of the test used, is that equitable tolling is applied using the general principles of equity outlined above. It is thus those general principles that govern this Court's analysis and that lead this Court to conclude that Mr. Price must prove the following to invoke equitable tolling: 1) he diligently pursued his rights, 2) some extraordinary circumstance prevented him from doing so, and 3) this is a compelling and exceptional case requiring a departure from the norm. *See Byers v. Robinson*, No. 08AP-204,

2008 WL 4328189, at *13 (Ohio Ct. App. Sept. 23, 2008) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

ACS of Ohio contends that Mr. Price did not diligently pursue his rights because he did not take adequate steps to uncover the identity of ACS or ACS of Ohio. (ACS of Ohio Mot. for Summ. J., at 10, ECF No. 62; ECF No. 72, at 15–17.) Mr. Price, on the other hand, insists that he was justified in relying on the information that the VA-Belmont provided to him. (Pl. Resp. to ACS of Ohio Mot. for Summ. J., at 13–15, ECF No. 68.) This debate is a familiar one. At an earlier stage of this case, ACS of Ohio moved for summary judgment on the same grounds as it does here, that Mr. Price's claims were barred by the statute of limitations. (ECF No. 31.) In ruling on this motion, the Court conducted a lengthy analysis to determine when Mr. Price's medical claim accrued and thus when the statute of limitations began to run. (ECF No. 52, at 11–17.) Specifically, the Court reviewed the relevant Ohio law to identify the "cognizable event" that triggered the statute of limitations—whether that was Mr. Price's cancer diagnosis or whether it was his discovery of the identity of ACS. (*Id.* at 11–12.)

The Court concluded that "Ohio law obligates a plaintiff alleging medical negligence to work diligently to determine the identity of the tortfeasor(s) upon becoming aware of alleged negligence." (*Id.* at 14.) But the Court also noted that there is a caveat to this general rule: "[I]f there exists a tortfeasor who was potentially involved in the alleged negligence of whom the plaintiff was unaware and had no reason to be aware, the statute of limitations does not begin to run until the existence of that tortfeasor becomes known (or should have become known)." (*Id.* at 14–15.) The question then was whether Mr. Price could take advantage of that caveat—i.e., whether he was unaware and had no reason to be aware of a tortfeasor responsible for his negligence. After reviewing principles of vicarious ability under Ohio law, the Court concluded

that that was not the case here because ACS of Ohio is a secondary tortfeasor, not a primary one. (*Id.* at 17.) That is, Mr. Price's alleged tortfeasors are the medical staff at the VA-Belmont, and ACS of Ohio is only secondarily liable as their employer due to the doctrine of *respondeat superior*. (*Id.* at 16–17.)

In Mr. Price's case, while he may not have known the identity of his primary tortfeasors' employer at the time of his cancer diagnosis, he did know the identity of his primary tortfeasors. Under Ohio law, that was enough to trigger the statute of limitations at the time of his cancer diagnosis on December 13, 2016. (*Id.* at 17.)

Mr. Price offers no principle of law to indicate that this same analysis should not control here. Although the equitable tolling analysis is different from the analysis for identifying the cognizable event, both require diligence. *Compare McCualsky*, 100 N.E.3d at 1055, *with Flowers v. Walker*, 589 N.E.2d 1284, 1288 (Ohio 1992) ("The occurrence of a 'cognizable event' imposes upon the plaintiff the duty to . . . ascertain the identity of the tortfeasor or tortfeasors."). It cannot be the case that equitable tolling can allow for an end-run around Ohio's rules for triggering the statute of limitations, particularly in light of this common diligence requirement.

To be sure, the equitable tolling and cognizable event analyses will not always run in parallel. For example, a defendant's inequitable conduct that is intended to delay a plaintiff's initiation of a lawsuit may support equitable tolling but would have nothing to do with the cognizable event analysis. But where, as here, the facts identified in support of equitable tolling are the same as the facts analyzed to establish the cognizable event, these analyses run concurrently. *Cf. Erwin v. Bryan*, 929 N.E.2d 1019, 1025 (Ohio 2010) ("Once the claim has

accrued, the failure of the plaintiff to learn the identity of an allegedly negligent party does not delay the running of the statute of limitations.").

Here, Mr. Price argues that he should not have been expected to seek out the identity of ACS or ACS of Ohio given that the VA-Belmont held itself out as being operated by the VA. The Court disagrees. Mr. Price was aware whom his alleged tortfeasors were—the medical staff at the VA-Belmont and at VAPHS—and it was his obligation to discover all other relevant facts required to initiate a lawsuit, including to make diligent efforts to identify, rather than assume, the employer of his alleged tortfeasors.

The ostensible unfairness of this situation is not lost on the Court. (*See* ECF No. 52, at 17.) "[D]efeated litigants, no matter how fairly treated, do not always have the feeling that they have received justice." *NLRB v. Donnelly Garment Co.*, 330 U.S. 219, 237 (1947). But in the end, the Court must apply the neutral principles of the governing law, and it is those neutral principles that compel the result here.

Because Mr. Price has not shown that he has diligently pursued his rights, he is not entitled to the application of equitable tolling. The statute of limitations has thus run on his claims against ACS of Ohio. The rest of Mr. Price's arguments are moot. ACS of Ohio's Motion for Summary Judgment is **GRANTED**, and Mr. Price's Motion for Summary Judgment is **DENIED**.

## V.  CONCLUSION

For the reasons set forth above, the United States' Motion for Summary Judgment is **DENIED**, ACS of Ohio's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**. The United States' Motion to Dismiss the negligent supervision claim for lack of subject matter jurisdiction is **GRANTED**.

What remains for trial is Plaintiff's claim against the United States for VAPHS's alleged negligence in failing to provide his 2015 PSA test results to Dr. Jones.

**IT IS SO ORDERED**.


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**